# Court of General Sessions of the Peace and Jail Delivery.

———◇———

## THE STATE v. DILL.

*Arrest without a warrant—Criminal Practice—Assault with Intent to Kill.*

Except an individual be taken in the criminal act, he cannot be arrested without complaint, on oath, made before a committing officer, and charging him with crime. If, at the hearing, there be probable ground for belief of guilt, he is held under bail for his appearance at court. He is then to be tried by a petit jury, if 12 of the grand jury concur in finding a true bill against him. The prisoner is allowed the State's process in procuring witnesses. In felonies above the common grade, if the prisoner be too poor to employ counsel, the court, at the public expense, will assign him counsel. The prisoner is allowed six peremptory challenges, and as many more as are peremptorily challenged by the State, who may object to three.

The accused is presumed to be innocent until proved to be guilty. When such proof is made, the presumption of innocence ceases altogether.

The prisoner shall be acquitted if his testimony, though comparatively weak, shall create in the minds of the jury sincere doubt of his guilt. Such doubt must grow out of the evidence alone in the case, and be supported by reason. It is not any fact proved by the defence which will justify a doubt of guilt, but such facts only as substantially impair the criminating proof.

A shotgun fired within killing distance, and aimed at a vital part, there being no proof to the contrary, shows intent to kill.

The inference which a jury is warranted in drawing from circumstances proved must be inconsistent with any other reasonable one.

*(Kent, November, 1889.)*

INDICTMENT for assault with intent to. kill.

*John Biggs*, Attorney General, for the State.

*James L. Wolcott* and *Edward Ridgely*, for defendant.

COMEGYS, C. J., charging jury:

Under the constitution of this State, and the system of law by which we are governed—the common law of English-speaking people everywhere—the greatest possible protection is afforded to the personal liberty of the citizen, and to his ultimate safety when charged with crime. In the first place, except where an individual is taken in the act, as we say, he cannot be arrested and deprived of that liberty without complaint on oath, made before a committing magistrate, charging him with the commission of a crime or misdemeanor. If, upon the hearing, there be probable ground to. believe the accused to be guilty, he is ordered to give security for his appearance at the ensuing term of this Court to answer the charge. But this order does not subject him to a trial before a petit jury, unless upon an indictment, framed by the Attorney General, and submitted to the grand jury, together with the witnesses in support of it, that body, by at least 12 of its number of 23, who may act, (and there must be 12 concurring, no matter if less than 23 are acting,) find the charge against him to be true; upon which result being attained, the foreman indorses upon the indictment the words "A true bill," and then the case assumes a very serious aspect. The arraignment then takes place, and if the prisoner plead not guilty to the charge, and desire witnesses to be summoned in his behalf, he is allowed the use of the State's process for that purpose, and if they fail to attend, the Court will have them arrested and compel them to do so. Further, if the crime charged be a felony above the common grade, as the one we are now trying is, and the accused be too poor to employ counsel, the Court, under a humane provision of law, will, at the public expense, appoint or assign competent counsel to defend him. Then comes,

at such reasonable time as is necessary to enable the prisoner to prepare his defense, a trial before a petit jury, in the selection of which from the general panel he is allowed six peremptory challenges —that is, without any cause assigned—and as many more as shall be equal to the number premptorily challenged by the Attorney General, who may object to three. There is an additional protection given the accused by the rule of law that a party charged with crime is to be presumed to be innocent until he is shown by proof to be guilty. Until such proof be made, the presumption continues; when made it ceases altogether. The case then goes on, and the proof of the State is to be met by proof in rebuttal produced in behalf of the prisoner; and no matter how positive and direct, or how apparently conclusive from circumstances, the proof in support of the indictment may be, the prisoner cannot be convicted, if his testimony, though weak compared with that on the part of the State, shall yet be strong enough to create, in the minds of an honest, conscientious jury, a fair, sincere doubt of his guilt. Were it not for the fact that some juries, from a repugnance to convict of high crime, or some less excusable cause, are active in their search after something to hang a doubt upon, and lay hold of anything in or out of the case for that purpose, I should not feel called upon to say anything more upon this subject; but for that reason, and to save you from the peril to your consciences from such a course, I think it proper to say to you, in the discharge of my duty to my place and to you as honest men, that the doubt I have spoken about must be one which grows out of the evidence alone in the case, and not anything outside of it, and it must be such a one as you feel you can support by reason sufficient, in your opinion, to control the judgment of any conscientious man. All imaginings, conjectures, and conceits are to be disregarded altogether; and in support of your doubt, if you have any, you must rely upon the proof in the cause alone. If you go outside of it, or allow anything in it which you feel in your consciences is not sufficient for that purpose, to furnish you with an excuse for asserting a reasonable doubt of

guilt, you will violate your sworn duty. I cannot think that any of you will risk so awful a peril to your consciences. You have sworn to render a true verdict, according to the evidence; there is no escaping that. With the consequence of it you have nothing to do. If you find the prisoner guilty, you simply say: "We believe the charge against the prisoner has been satisfactorily proved, and that beyond a reasonable doubt."

There is still another guard thrown around parties indicted and tried for crime, which has its application to cases like that you are trying. I shall speak of it hereafter. I will now proceed to treat of this particular case which we are trying.

This is a charge of assault by the prisoner committed upon and of the person of James Porter with intent to murder him. In such indictments, the proof of the assault, and that it was made by the accused, is usually proved without any difficulty; but as the crime is laid, with intent to commit murder, the contest is about the intent; and as intent is a purpose of the mind it can rarely be shown, except by proof of external circumstances which disclose the inward intention. Sometimes, but not often, the perpetrator of a crime depending upon intent declares his purpose. When that is the case of course there is no difficulty about the proof. In this case there is no room for any conjecture, even about the purpose of the assassin—it was to kill; for the weapon used was a shotgun, (as shown by the wound inflicted,) fired within killing distance, about 45 feet, and was aimed at a vital part, the head of the victim. The intent, therefore, there being no proof to the contrary, is plain—to take the life of the victim. By the mercy of heaven, it failed. If this evident purpose of the assassin had succeeded, the crime would have been murder of the first degree—lying in wait (which the evidence shows was done here) being one of the evidences which stamp a homicide as such crime. We have no inquiry, therefore, about the assault, of which there is positive and no countervaling proof; nor about the intent, which the wound shows. And the facts thus established are examples of the two species of proof

by which conclusions are arrived at in courts of justice.    The proof
of the assault is positive, by the testimony of Porter, and his
wound as seen by others; that of the intent is impossible, from the
circumstances I have pointed out, and is therefore circumstantial.

It may be said of proof generally, as it is considered in the
courts, that it is of two kinds,—direct, or positive; or indirect, or
circumstantial.    To give a plain illustration:    Two men are quar-
reling, with another looking on.    One knocks the other down, and,
upon legally inquiry into the matter, the bystander swears that he
saw the blow given and the fall.    This is positive proof.    But if
the by-stander had, immediately before the fall, turned his head in .
another direction, and had not seen the blow or heard it, the fact that
he found the prostrate party on the ground when he did look would
be entitled to be treated as sufficient evidence to convict the other
party of assault and battery, if the strickened party could not be
produced.    This would be circumstantial evidence only.    But as,
according to all human experience, quarrels frequently result in
blows, unless the party charged could satisfactorily show that some
other cause than a blow from him produced the fall of the other,
no jury would be justified in acquitting him.    The circumstances
having been first satisfactorily proved positively, in the absence of
sufficient explanation by the party accused, they would indisputa-
bly point to him as the offender.    Positive proof that he gave the
blow, there would be none, for he was not seen to do it; and yet
the circumstances, established to the satisfaction of a jury in such
a case, would be such as to leave no room for any reasonable doubt
upon the subject.    While most cases, perhaps, tried in this court,
are supported by positive proof, yet there is a vast number which
depend for conviction almost, and some of them altogether, upon
circumstantial testimony, or proof of circumstances from which
the inference of guilt is drawn by juries.    Most cases of house-
breaking and stealing are supported by proof of circumstances.    So
of all crimes done in secret, as forgeries, embezzlements, and the
like.    The denunciations of crime in your statute book would be

fulminated in vain, if convictions could not be had except upon positive proof of guilt. The similarity between the forged paper and the handwriting of the party charged is the proof for conviction, for the forger does his work in secret. The possession by the embezzler of some of the money which can be indentified by positive proof convicts him; so of the house-breaker and of the thief. And so where possession of the property by the thief cannot be shown, and yet he has left behind him, at the place where it was taken, some article of property known to be his, particularly if that or something similar was necessary in order to enable him to commit the theft; or where there are recent tracks to or from the scene of the crime, which, being followed, leads to his dwelling-house, or the place where he is found, which tracks are similar to those himself would make, a jury would be perfectly safe, in the absence of proof to the contrary, in finding a verdict of guilty. In fact, with such proof, there would be no ground for acquittal, unless it compelled the mind of the jury to doubt the party's guilt. It is obvious that, unless the countervailing proof was satisfactory for the jury's minds, there would be nothing to repel the conclusion of guilt. It is not any fact proved by the defense which will justify a doubt of guilt, but such facts only as disturb the current of the criminating proof, (supposing that to be adequate,) and weaken its force to the extent of substantial impairment.

It is by no means uncommon to hear that a person should say he would not convict any one on circumstantial proof alone. All such declarations, supposing their author to be a man of sense, must be either the result of gross inexperience with the affairs of the world, or from want of proper reflection. In every case of conviction on such proof it is the ultimate inference alone which is not directly proved. All the facts—circumstances—which support the inference are proved as facts are in any other case. If these facts, satisfactorily established, lead, according to common human experience, to one result, then it is the ultimate fact growing out of or proceeding from them, and should be found by the jury. When

in any case, certain necessary facts are proved in support of a charge, which facts, believed by the jury to be true, point to but one conclusion, and their force, after all attempts to weaken it, still remains unimpaired, there is no ground upon which a jury can deny them their full effect. To do so would be to ignore and disregard the teachings of all human experience. While it may be barely possible that a conclusion to which the established circumstances of a case lead may not be the correct one, (as nothing seems to be positively certain in the affairs of mankind,) yet if no other one be submitted to a jury, inconsistent with such conclusion, it should be unquestionably adopted. For although it be true, as it is, that in a case of imputed guilt from circumstances, as this is, an accused party should not be convicted upon the theory they support, if such circumstances are not inconsistent with any other rational theory, yet such other rational theory must be pointed out to the jury, and be supported by proof, be drawn from the evidence in the cause, or have, as its basis human experience and observation, as well as that which it opposes. To suggest another theory upon facts proved, than that which seems the obvious one, is easy enough done; but the suggestion should be supported by something which repels that which it is intended to meet, and this to the satisfaction of the jury, because it is the more reasonable of the two.

Further, with respect to motives, about which much has been said, I cannot do better than read to you what has been said by an eminent legal writer upon that subject, in a standard work on circumstantial evidence. I refer to *Wills on Circumstantial Evidence*. " All the actions of a rational agent are prompted by motives, and are therefore really moral indications, though it be not always practicable to develop their moral relations." *Wills Circ. Ev.*, 54. " It must not be expected that motives shall be discovered which, tried by the strict rules of morality, will be regarded as adequate. It is of the essence of moral weakness that it forms a mistaken estimate of present advantage, and a want of correspon-

dence and proportion will therefore of necessity be found, between the objects of desire and the means employed to obtain them. The assassin's dagger may be put in requisition for a few pieces of gold; and the difference between that and other inducements to crime is a difference only of degree." *Id.*, 59. " It must ever be remembered that with motives, merely, the legislator and the magistrate have nothing to do; and that actions and external facts, as the ends or objects of motives, are the only legitimately cognizable subjects of human tribunals." *Id.*, 60. " On the other hand, as an action without a motive would be an effect without a cause, and as the particulars of external situation and conduct will in general correctly denote the motive for a criminal action, the absence of all evidence of an inducing cause is reasonably regarded, where the fact is doubtful, as affording a strong presumption of innocence." *Id.*, 61. " It occasionally happens that actions of great enormity are committed for which it is impossible to discover any motive. In such cases, which are not of frequent occurrence, upon principles of reason and justice essential to common security, the actor is held to be legally accountable, unless it be clearly and indubitably shown that he is incapable of distinguishing the moral qualities and tendencies of his actions." *Id.*, 63, 64. The history of criminal trials is by no means barren of cases of atrocious crimes committed where no motive whatever appeared. One of them is that of Philip Nicholson, for the murder of Mr. and Mrs. Bouar, at Maidstone, in Kent county, England, with whom he lived as a servant. *Celebrated Trials*, Vol. 6, p. 125.

And now, gentlemen, a few words, with respect to the facts testified to in this case, and then I shall commit it to you for your decision. Those adduced on the part of the State are the ones upon which reliance is had for conviction. It will be for you to say whether, in your opinion, they are, taking all pertaining to the case into consideration, sufficient for that purpose; that is, whether their force and cogency, if they have any, are such as to require of you your assent to such sufficiency. There being no direct proof of

he prisoner's guilt, the circumstances that attended the shooting of Porter, as were developed in the inquiry made to ascertain the criminal who did it, are of the first importance to you in making up your verdict. It is those circumstances upon which alone the State can rely to make out its case. Let us look at them, as they have been laid before you by the testimony of the witnesses. Bear in mind that the crime here was committed by one lying in ambush for the purpose, and who must have immediately fled. He failed of his purpose to murder Porter by the shot, and, having no charge in the other barrel, he could do nothing but fly. From the testimony as to the state of the ground where he stood, under the shed, it is evident that he had been waiting there for his victim a considerable time. Indeed, I think we may assume that he reached that place about or before day-break. I think we may also infer that he had become impatient and nervous; the frequent change of position being shown by the confused foot-prints. Impatient or nervous people cannot usually stand still, and, when their nervousness is caused by the contemplation of a murderous crime purposed, the more intense their excitement. About the time of the shooting and fight—so near as to be a circumstance of the transaction—a man is seen by three different persons, according to their several statements as witnesses, passing, sometimes in a fast gait or run, as was said, from the direction of the road to Whiteleysburg, through and over certain open ground or fields, in the direction of the premises of William Hopkins; and according to the testimony of Hopkins and the witness Laws, the prisoner, so near or about that time as to make it not unlikely that he might be that man, came to the house of Hopkins, and took his breakfast there. By Hopkins' testimony he did not appear excited or embarrassed. The man in a run had passed out of view of those who saw him; in fact, they seem to have taken but very little notice of him at all. The prisoner lived some seven miles away from the house of his brother-in-law, Hopkins; but he was there at so early an hour, and on foot. By good walking, seven miles can be

covered by a good footman in about two hours,,—a fact of common experience. The prisoner, therefore, if he came directly from home, (which is the only plausible inference that can be drawn,) must have left home sometime in the night. Why he was there at such an early hour has not been shown to us by any proof. Mr. Hopkins, at his request, took him home soon after breakfast. In the course of that day, it is stated by the witness Benjamin McKnatt, a search was made, with the view of finding, if possible, the gun with which Porter was shot; for it was answered, to McKnatt's inquiry of the witnesses who testified to seeing the man going towards Hopkins' premises, that he had nothing in his hand as he went along. After scouring the woods near Porter's house (whither the assassin fled) with no result, search was made under a pile of corn-stalks in a small lot, part originally of the woods, and there the gun in evidence before you was found. It had only had one loaded barrel for same time before, as it was sworn appearances indicated, and that one it was also sworn had been very recently discharged, as it was said by the witnesses. That, it is admitted by the learned counsel for the prisoner, is, in their belief, the gun used to shoot Porter. The State's contention is that the gun belongs to the prisoner, that he shot Porter with it, and that he hid it in the stalk-pile, and then continued his flight towards his brother-in-law's, William Hopkins, and arrived there as stated, and that he is the man seen by the colored witnesses. Rasin swore that, when he first saw the man he referred to, he was proceeding from the ground where the piles of stalks were.

The colored witness, Laws, who lived some time last year with the prisoner, swore that he sometimes used the prisoner's gun ; but that, the iron extractor having become broken, he replaced it with one made of lead, which he moulded himself. He also stated that the prisoner said to him, on one occassion, that he should take the gun to Dover for repair. Accordingly, in the fall of last year, he brought to Dover a gun to be repaired, which he took to the gun-smith and witness, Culveyhouse, for that purpose. Mr. Culvey-

house, being affirmed, stated that the prisoner did bring a double-barreled gun to him for repair,—a Moore gun, similar to that in evidence before you ; but whether that before you is the one brought he was not willing to state.   However, he found in it a lead extractor, which he removed, and he testified that he had never seen one in a gun before.   Upon the gun being shown to him, he took out the extractor, which is of iron, and said it was not made with the gun, but had been made since.   Upon being asked whether he did not make it, he would not answer positively, but said he thought he did.   His attention being called to the screw which held it in its place, he said, in reply to the question of the attorney general, wheter he made it or not, that he believed he did.   I noticed that his language was different when speaking of the screw.   The colored witness last named, Benson, said he once measured the gun of Dill, and that it was just 30 inches long in the barrel.   The measurement was done with an iron square.   The gun in proof measures $31\frac{1}{2}$ inches, and Mr. Culveyhouse said it would be called a 32-inch gun.   He did not measure it.   If the gun in proof is the one that the prisoner took to Culveyhouse for repair, and from which he took a leaden extractor to be replaced by an iron one, then the boy's measurement of the barrel was wrong.   If you believe, from the testimony, that the gun shown is, in fact, that taken to Culveyhouse by the prisoner for repair, then that gun is the one that shot Porter.

You have, then, two or more circumstances concurring to support the theory that the prisoner is guilty of the crime laid in the indictment,—his presence about the locality where Porter was shot; and the gun, in proof, hidden in the pile of stalks, and with which it is claimed, and not disputed, that the shooting was done.   If you believe the testimony of Rasin, that the man whom he saw going towards Hopkins' premises was first seen by him going across the lot where the stalks were, it would not be at all unreasonable, in fact it would seem to be a very just inference, that the prisoner was the man proceeding towards Hopkins', and that he hid the gun in the stalks.   If you should think that to be the fact, then you have

circumstances from which the conclusion would seem a safe one that the prisoner shot Porter. The finding of the recently exploded gun in the pile of stalks near the scene of the tragedy, and the fact that such finding was made known to the prisoner on the day of his arrest, reasonably required of him that he should produce his gun, if the one found was not his, for his protection against the charge of the assassination of Porter; but he has never done it, so far as we know. He made a show of doing it at Greensborough, but the one he claimed to be his did not belong to him.

If the before-stated facts, in your opinion, point to the prisoner at the bar as the man who shot Porter, then do they also point in any other direction than that leading to him? If they do point to him, and do not point elsewhere, then they are consistent with the reasonable inference that he was the assassin, and are inconsistent with any other rational conclusion,—thus fulfilling the legal requirement, in cases of circumstantial evidence, that the inference which a jury is warranted to draw from circumstances proved must be inconsistent with any other reasonable one. It will be apparent, from what I have said, that the identity of the tracks traced, with the prisoner's own tracks, or with those that would be made by the use of the gum boots shown, is not a necessary link in the chain of evidence requisite for his conviction. If the other circumstances in proof before you are felt to be sufficient, then the tracks, about which so much has been testified by the witnesses, and spoken to you by the respective counsel, do not play a necessary part in the inquiry to discover the criminal agent in this case. If the testimony given, however, in support of the contention about them, shows satisfactorily to your minds that they were his, then there would be, if you felt it to be wanted, strong corroborative proof, by another important circumstance, in support of the conclusion, (if you had adopted it,) resulting from the unexplained presence of the prisoner where he was on that memorable morning, and the hidden recently exploded gun in the line of the course taken by the person seen by Rasin crossing (in the direction of Hopkins' premises) the grounds

where the pile of stalks was, under which concealment of the gun was made, that he was the person seen, and that he fired the murderous shot with that gun. If, after considering and deliberating upon all the evidence in the case, your minds reach the confident conclusion that the prisoner at the bar is guilty of the crime with which he is charged, and you find in that evidence no reasonable ground to doubt the correctness of that conclusion, then your verdict should be that of guilty. If, on the contrary, looking at that evidence alone, and heeding nothing else, you, as honest, conscientious men, feel there is good reason to doubt the prisoner's agency in the crime, then you ought to acquit him.

Verdict of guilty.